UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

UNITED STATES OF AMERICA,

    -   against    -           **MEMORANDUM & ORDER**
                                      13-CR-448 (MKB)

WINSTON NICHOLAS CARR,

                          Defendant.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Defendant Winston Nicholas Carr is charged in a two-count indictment with importation of cocaine in violation of Title 21, United States Code, Sections 952(a), 960(a)(1) and 960(b)(1)(B)(ii), and possession of cocaine with intent to distribute in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)(II).  On January 21, 2014, Carr moved to suppress statements he made to law enforcement agents on July 3, 2013.  The Court held a suppression hearing on July 21, 2014.  For the reasons discussed below, the Court grants Carr's motion in part and denies it in part.

## I.    Background

### a.    Facts alleged in the Complaint

According to the facts alleged in the Complaint filed on July 5, 2013, on or about July 3, 2013, Defendant Carr arrived at John F. Kennedy International Airport in Queens, New York ("JFK Airport") from Georgetown, Guyana.  (Compl. ¶ 1.)  Upon his arrival at customs, Carr was selected for a United States Customs and Border Protection ("CBP") examination.  (*Id.* ¶ 2.) He presented one large purple suitcase and one smaller purple suitcase to CBP and answered standard CBP examination questions: he stated that he owned both suitcases, that he had packed the bags himself, and that he owned all of the contents therein.  (*Id.*)

During the luggage inspection, CBP officers noted that the bottom of the smaller suitcase was "unusually thick and heavy." (*Id.* ¶ 3.) An X-Ray of both suitcases revealed a mass on the bottom of each suitcase. (*Id.*) CBP officers then escorted Carr to a private examination area, where the luggage was probed to reveal a white powdery substance, which field-tested positive for cocaine. (*Id.*) Carr was placed under arrest. (*Id.*)

### b. Motion to Suppress

On January 21, 2014, Carr moved to suppress all statements made to law enforcement agents on July 2, 2013, on the grounds that the statements (1) were not the product of a knowing and intelligent *Miranda* waiver in violation of the Fifth Amendment, and (2) were not voluntary. (Def. Mot. to Suppress Statements dated Jan. 21, 2014 ("Mot. to Suppress") at 1, Docket Entry No. 17.) Carr requested an evidentiary hearing, which was held on July 21, 2014.

### i. Carr's motion

In his motion, Carr argues that the statements obtained during the July 3, 2013 CBP examination are the product of a custodial interrogation and should be suppressed because the government did not obtain a knowing and intelligent *Miranda* waiver before interrogating him. (Mot. to Suppress 5.) In Carr's declaration in support of his motion, he states that upon landing at JFK Airport, he proceeded to the customs area. (Def. Decl. in Support of Mot. to Suppress Statements ("Carr Decl.") ¶ 1, Docket Entry No. 20.) He was escorted to a secondary inspection area, where CBP officers searched his luggage. (*Id.*) After the secondary search, two armed and uniformed officers further escorted him to a small private inspection room, where he was ordered to sit on a bench. (*Id.* ¶ 2; Def. Reply to Gov. Opp'n to Def. Mot. to Suppress Statements ("Def. Reply") 2, Docket Entry No. 19.) A third officer entered, and Carr was handcuffed. (Carr Decl. ¶ 2.) CBP officers stood over Carr while his luggage was inspected. (*Id.* ¶¶ 2–3.) At that time,

"it was clear to [Carr] that [he] was under arrest and not free to leave." (*Id.* ¶ 5.) He was

questioned about importing narcotics, and "told [] that I was in a lot of trouble . . . [,] that I was

responsible for importing the drugs and that I should accept responsibility. They asked me if I

had done this before and who else was involved." (*Id.* ¶ 3; *see* Mot. to Suppress 7.) Despite his

"attempt[] to invoke [his] Fifth Amendment rights," the officers continued to ask him questions,

which he ultimately answered. (Carr Decl. ¶¶ 3–4.)

### ii. Government's response in opposition to the motion

The government argues that Carr was not subject to a custodial interrogation because he

was not in "custody" as to warrant *Miranda* warnings, and therefore the motion should be denied

without a hearing. (Gov. Opp'n to Def. Mot. to Suppress Statements ("Gov. Opp'n") 2–14.)

The government further argues that Carr's statements were voluntary, and thus admissible.[1] (*Id.*

14–16.)

### c. July 21, 2014 Suppression Hearing

On July 21, 2014, the Court heard testimony from Dominika Czechura, an officer with

CBP, Stephen Twarowski, a supervisory officer with CBP, Michael Marmol, an officer with

CBP via video, Joseph Finn, a supervisory officer with CBP, Steven Tepper, a supervisory

officer with CBP, and Iliana Pagan, an agent with Homeland Security Investigations ("HSI") (Tr.

of Suppression Hr'g ("Tr."), dated July 21, 2014, 5:9–11, 79:25–80:2, 139:4–7, 149:19–21,

---

[1] In the alternative, the government argues that even if there is a basis to suppress the statements, evidence of the statements can nevertheless be used during trial to impeach Carr. (Gov. Opp'n 16–17.) As an initial matter, statements obtained in violation of *Miranda* are sometimes admissible for impeachment purposes. *See Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir. 2003) ("[S]tatements taken in violation of *Miranda*, though inadmissible as part of the prosecution's case-in-chief, are nevertheless admissible for impeachment purposes where they are also voluntary and uncoerced." (citing *Oregon v. Hass*, 420 U.S. 714, 722–24 (1975); *Harris v. New York*, 401 U.S. 222, 224–26 (1971))). However, the issue of impeachment is not the subject of Carr's motion, and thus will not be addressed at this juncture.

162:3–5, 173:23–25.) Each testified about the events leading up to and immediately following Carr's arrest on July 3, 2013. Based on the evidence presented, the Court makes the following findings of fact.

### i. Luggage inspection

On July 3, 2013, Carr arrived at JFK Airport, proceeded to a baggage control point (also referred to as "primary" screening) in the international arrivals terminal and presented himself to Officer Marmol for inspection. (Tr. 140:12–16.) Based on the inspection, Officer Marmol referred Carr to the secondary baggage control point for additional screening. (Tr. 140:15–17, 141:4–7.) In the secondary baggage area, Officer Czechura questioned Carr regarding his luggage and recent travel, and physically inspected Carr's two pieces of luggage. (Tr. 13:5–15:3.) In the course of her inspection, Officer Czechura noticed that the smaller piece of luggage appeared "unusually heavy." (Tr. 14:9–12.) Officer Czechura removed the contents of the suitcase for further inspection. (Tr. 14:13–14.) She noted an extra lining in the bottom of the bag and unzipped it to reveal a hard, translucent plastic surface. (Tr. 14:15–19.) Unable to probe around the hard plastic surface, Officer Czechura decided to X-ray the bag. (Tr. 14:21–15:7.) Officer Czechura asked Officer Telese, a CBP officer standing nearby, to "keep an eye on" Carr while she went to the X-ray machine. (Tr. 39:5–8.)

On the way back from the X-ray machine, Officer Czechura advised Officer Tepper that she believed there was contraband in Carr's luggage. (Tr. 16:21–23.) Officer Tepper followed her back to the secondary belt area. (Tr. 40:14–15.) Officer Czechura also told Officer Twarowski, located at a secondary inspection point near her, that she believed she had found narcotics or other contraband. (Tr. 40:16–17, 83:19–25.) She returned to the luggage belt and ripped a portion of the lining in the smaller suitcase, which revealed a white powdery substance

and grey tape.  (Tr. 16:19–17:5, 41:1–6.)  Upon her discovery, she asked Carr when he got the

bags.  Carr did not reply.  (Tr. 18:7–18.)  She repacked Carr's bags and she and three other

officers took Carr to a secure, private inspection room (the "pat-down room").[2]  (Tr.

18:23–19:18, 84:21–85:23, 104:2–10; *see also* Gov. Exs. 7–11.)

### ii.  "Pat-down room" inspection

During the walk to the pat-down room, Carr was placed in an "escort hold," which

required two officers to each hold Carr with both hands: Officers Twarowski and Telese stood on

either side of Carr and each placed one hand on Carr's tricep and the other hand around his

wrist.[3]  (Tr. 84:21–85:6, 102:6–24, 103:2–8.)  The CBP Officers were "surrounding" Carr on at

least three sides.  (Tr. 20:9–20:13, 104:2–10.)  All four officers were armed, though each carried

his weapon in his holster.  (Tr. 20:14–17, 39:23–40:3, 41:20-42:1, 92:20-93:2.)  Carr was walked

around the back of the baggage claim area, through locked doors, into a small room with no

windows and one door.  (Gov. Exs. 9–11; Tr. 21:1–22:6.)  He and the four officers all entered the

10-foot-by-10-foot room.  (Tr. 22:7–12, 87:16–18.)  Throughout the time Carr was in the pat-

down room, approximately seven CBP officers were in and out of the room, although it is

unclear if all seven were ever present at the same time.[4]  (Tr. 63:8–10.)

---

[2]  Officer Marmol indicated that the "pat-down room" was often used for questioning.
(Tr. 142:25–143:5.)

[3]  According to Officer Twarowski, this restricts movement and would permit the officers
to prevent a suspect from fleeing, in the event a suspect tried to leave.  (Tr. 102:15–18.)

[4]  The four CBP officers who escorted Carr to the room and two other officers, Officer
Marmol and Officer Finn, are accounted for.  Officer Marmol, the CBP officer at the primary
baggage control point who referred Carr to Officer Czechura for secondary inspection, went on
his own initiative to "see what was going on."  (Tr. 141:16–142:7.)  Officer Finn also came by
the room.  (Tr. 109:16–110:5.)  The seventh officer, or any other officer who may have entered
the room, was not specifically identified by any of the witnesses.

Upon entering the room, Carr was directed to sit, with his back to the wall, on a bench that contained a leg shackle. (Tr. 42:19–43:5, 88:6–16.) Carr was not immediately handcuffed or shackled to the bench.[5] (Tr. 110:6–111:1.) Officers Telese and Tepper stood close to Carr on either side of him, and Officer Twarowski stood in front of him, facing him, about one and a half to two feet away. (Tr. 23:7–12, 91:18, 93:6–7.) While in the room, Officer Czechura removed all the items from Carr's suitcases, and proceeded to assemble field drug testing kits. (Tr. 23:1–6, 113:9–14.)

According to Officer Twarowski's testimony, within a few minutes of entering the room and directing Carr to sit, "someone had asked Mr. Carr if he was traveling with anybody else, [or] if anybody is waiting outside . . . ." (Tr. 89:18–90:10, 91:1–4.) Officer Twarowski did not recall who had asked that question, but explained that it was the CBP officers' usual practice to ask if someone was waiting outside "because, essentially, when somebody smuggles something in, a lot of the time we find out there was somebody else on the flight because they'll send two drug mules at the same time." (Tr. 89:18–90:19.) When Carr did not respond to the initial question, Officer Twarowski asked Carr again if there was anybody waiting outside for him, and if Carr was traveling with anybody. (Tr. 90:20–23, 116:3–6.) Carr then responded in the negative and added that he brought "it" for himself so he could sell "it" for himself to make some extra money ("First Statements"). (Tr. 90:23–25; *see also* Def. Ex. B 1.)

---

[5] Carr was eventually handcuffed and may have been shackled to the bench. (*See* Mot. to Suppress 7.) It is not entirely clear from the record at what time Carr was handcuffed or whether he was ever shackled to the bench. Officers Czechura and Twarowski indicated that Carr was handcuffed after he was arrested. (Tr. 23:1–21, 25:11–26:3, 92:17–19, 95:17–96:3.) It was the CPB officers' normal practice to use the leg shackle to detain arrestees, (Tr. 88:6–23), and to use handcuffs on passengers found to be carrying drugs, (Tr. 165:10–19). Officer Tepper "assumed [Carr] may have been handcuffed to the bench" when Tepper arrived in the pat-down room, although he could not "say for certain." (Tr. 165:10–19, 168:1–5.) Officer Marmol similarly could not recall when Carr was handcuffed. (Tr. 143:7–18.)

Around the time Officer Twarowski asked Carr if he was traveling with anyone, again within a matter of minutes, Officer Finn arrived in the pat-down room. (Tr. 91:1–9.) Officer Finn repeated the same questions Officer Twarowski had just asked Carr, and Carr gave the same answers ("Second Statements"). (Tr. 91:1–14.) According to Officer Twarowski, Officer Finn also told Carr that there was "a lot of weight" for a lone traveler to be carrying for himself. (Tr. 91:6–9, 118:3–8.) Officer Finn had no specific recollection of what he did on this occasion, but he did testify that it was his usual practice, when drugs were found in luggage, to question the passenger who owned the luggage about whether the drugs belonged to him. (Tr. 154:17–156:15.)

The record is not clear as to who else asked Carr questions, and what those questions were. In December of 2013, Agent Pagan interviewed Officer Twarowski about the July 3, 2013 arrest. (Tr. 178:25–180:4.) Officer Twarowski told Agent Pagan that he questioned Carr about who owned the drugs, but Agent Pagan did not believe Officer Twarowski had asked Carr "directly about the drugs themselves." (Tr. 184:8–11, 186:12–20.) Officer Twarowski told her that "Carr was asked by a CBP officer if he had gotten drugs for himself and if someone was waiting outside for him but Carr did not respond," (Tr. 186:22–187:1), and that Officer Finn asked Carr "if he had done this before, meaning, if he had smuggled drugs before,"[6] (Tr. 184:20–23, 197:12–18). Carr responded "no, first time" ("Third Statement").[7] (Def. Exh. B 1.)

---

[6] Officer Twarowski could not recall telling Agent Pagan that Officer Finn questioned Carr about smuggling drugs, or that Carr responded that it was his first time. (Tr. 118:24–119:9, 124:14–19.) Officer Twarowski was not asked at the suppression hearing whether other officers questioned Carr about smuggling drugs.

[7] At the time Carr made the statements in question, Carr had not been given *Miranda* warnings. (Tr. 94:24–95:7.)

At the hearing, however, none of the officers recalled asking Carr about the weight or ownership of the drugs, or whether it was Carr's first time smuggling. As noted above, Officer Finn had no specific recollection of the day in question. (Tr. 154:17–25.) Officer Twarowski did not recall questioning Carr specifically about the ownership of the drugs. (Tr. 116:1–9, 125:1–11.) Officer Czechura did not ask Carr any questions in the pat-down room. (Tr. 24:7–24:21, 26:19–23.) Officers Marmol and Tepper did not recall any questioning. (Tr. 142:9–143:9, 164:4–13.)

### iii. Arrest and luggage inventory

After approximately 15 to 20 minutes in the pat-down room, Officer Czechura confirmed that the substance in Carr's bag tested positive for cocaine and informed Carr that he was under arrest for the importation of narcotics into the United States. (Tr. 24:7–11, 25:11–18, 28:17–22, 136:6–16.) She did not Mirandize him, nor did she hear anyone else read *Miranda* warnings to him. (Tr. 27:6–15.) Around the time of the arrest, the substance in the second suitcase was drug-tested. (Tr. 54:1–56:9; Def. Ex. A.) Carr's luggage was then inventoried. (Tr. 26:11–13, 94:4–15, 147:20–148:8.) Either following the field testing of the substance in Carr's luggage or during the luggage inventory, likely after his arrest, Carr was patted down by Officers Twarowski and Telese and placed back on the bench. (Tr. 25:11–26:3, 95:17–25.) According to Officer Czechura's typical protocol, "[a]t that point, he would have been handcuffed . . . ." (Tr. 25:14–25.) Officer Twarowski recalled that someone "explained to [Carr] that the agents would come down and they're going to talk to him and ask him some more questions . . . it's in his best interest not to speak, not to say anything else, and just to wait until they arrive." (Tr. 136:6–16.) He did not give Carr a *Miranda* warning. (Tr. 94:24–95:14.)

At some point after the arrest, Officer Czechura heard Carr state, "You got me" ("Fourth Statement"). (Tr. 25:1–5, 26:15–18.) No one else heard this statement. (Tr. 25:1–5.) Officer

Czechura testified that Carr made the statement while she was inventorying Carr's luggage, which she is certain did not happen until after she placed Carr under arrest.[8] (Tr. 25:1–26:18.) Officer Czechura was not certain, however, about whether Carr made this statement prior to or after the pat-down. (Tr. 26:4–10.)

Eventually, agents from HSI, including Agent Pagan, collected the evidence and Carr. (Tr. 176:10–177:9.)

## II. Discussion

### a. Custodial interrogation

Carr argues that he was subject to custodial interrogation in the pat-down room and therefore any of his statements made prior to a *Miranda* warning are inadmissible.[9] The government concedes that Carr was not advised of his *Miranda* rights prior to the arrival of HSI agents, but argues that Carr was not subject to custodial interrogation and therefore a *Miranda* warning was unnecessary. For the reasons stated below, the Court agrees with Carr that he was subject to custodial interrogation in the pat-down room prior to his arrest.

"In *Miranda v. Arizona*, the Supreme Court held that the 'in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not

---

[8] Officer Marmol confirmed that the luggage inventory took place after Carr's arrest. (Tr. 147:20–148:8.)

[9] Carr's initially sought to suppress all statements made to law enforcement on July 3, 2013. (Mot. to Suppress at 1.) However, as counsel conceded in Carr's Reply Brief and at the suppression hearing, Carr has no basis to challenge the admissibility of statements he made in response to initial questioning at primary and secondary baggage screening. (*See* Def. Reply at 2 n.1; Tr. 3:1–5:4.) While those statements inform the circumstances surrounding Carr's purported custody and interrogation, they are not subject to suppression. Carr's motion to suppress the statements made prior to being taken to the pat-down room is denied.

otherwise do so freely.'" *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). As a procedural safeguard, the Supreme Court established the now familiar *Miranda* warnings, which it believed necessary "to secure the privilege against self-incrimination." *Donelli*, 588 F.3d at 154 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)). "The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) (citing *Miranda*, 384 U.S. at 444–45; *Terry v. LeFevre*, 862 F.2d 409, 412 (2d Cir.1988)). However, "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011); *Donelli*, 588 F.3d at 155 ("*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" (quoting *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004))).

Determining custodial interrogation involves "two parts: (a) there must be an interrogation of the defendant, and (b) it must be while [the defendant] is in 'custody.'" *FNU LNU*, 653 F.3d at 148 (citing *Cruz v. Miller*, 255 F.3d 77, 80–81 (2d Cir. 2001)). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "[T]he overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have understood' herself to be 'subjected to restraints comparable to

those associated with a formal arrest.'" *FNU LNU*, 653 F.3d at 153 (alterations in original) (quoting *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (per curiam)).

On a motion to suppress in a criminal trial, the defendant bears the burden of demonstrating the basis for the motion — in this case, that he was subject to custodial interrogation. *United States v. Funaro*, 253 F. Supp. 2d 286, 293–94 (D. Conn. 2003) (citing *United States v. Masterson*, 383 F.2d 610, 614 (2d Cir. 1967)); *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004). Once a basis has been established, "the prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his Miranda rights, and that his confession is truly the product of free choice." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986)).

### i.   Carr was in custody in the pat-down room

The government first asserts that Carr was not in "custody"— that is, that a reasonable person in Carr's position would not have considered himself subject to restraints approximating a formal arrest while he was in the pat-down room prior to his formal arrest. *See Acosta*, 575 F.3d at 189 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Carr argues that he was subject to circumstances under which "no reasonable person would believe that they were free to terminate the questioning and go about their way." (Mot. to Suppress 5.)

"The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *United States v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004); *see also FNU LNU*, 653 F.3d at 153. The "ultimate inquiry" for determining *Miranda* custody is whether a reasonable person in Carr's position would have considered himself subject to a restraint on freedom of the degree associated with formal arrest. *See Newton*, 369 F.3d at 670. In assessing whether one was in "custody," courts examine the totality of the circumstances,

including "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (citations omitted). Also, an additional relevant factor, "and especially so in border situations, [is] the nature of the questions asked." *Id.* (citing *United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003)). However, there is no broad "border exception" to *Miranda*'s requirements. *FNU LNU*, 653 F.3d at 148–52.

Carr was physically removed from the public screening area and escorted by four armed officers to a separate, private pat-down room. (Tr. 84:22–85:18, 104:5–10.) He was directed to sit on a bench with his back to the wall and three of the four officers who escorted him into the room surrounded him. (Tr. 42:19–43:4, 91:18, 93:6–7.) While no handguns were drawn, and even assuming that Carr was not immediately handcuffed when he was brought into the pat-down room, the totality of the circumstances, including Carr's removal from the public area to the private pat-down room, the manner in which he was escorted by two officers, each with both hands on Carr, and the CBP-dominated atmosphere in the room, strongly suggest a degree of restraint associated with formal arrest. *See United States v. Ali*, 86 F.3d 275, 277 (2d Cir. 1996) (finding custody when defendant was asked to step away from the airport boarding area and surrounded by seven officers with visible handguns); *see also Miranda*, 384 U.S. at 445 (noting defendants were interrogated "incommunicado," and "in a police-dominated atmosphere").

In addition, the nature of the questions asked by the CBP officers support a finding that Carr was in custody at the time he was placed in the pat-down room. *See FNU LNU*, 653 F.3d at 153. Carr was repeatedly asked where he obtained his bags, and with whom he was traveling.

Carr was told there was a "lot of weight" for him to be traveling alone. (Tr. 91:6–9, 118:4–8.) By his own account, Carr was directly asked about the ownership of the drugs and whether he had smuggled drugs into the United States before, (Carr Decl. ¶ 3), and Officer Finn conceded that it was his typical practice to ask such questions, (Tr. 184:20–23). While a reasonable individual may expect a brief detention at the border and some questions about his or her personal information and travel, a reasonable person in Carr's position would not see this encounter as attendant to a routine screening at an international border.[10] A reasonable person in Carr's position, given the manner in which he was escorted to the pat-down room, the atmosphere in the room and the nature of the questioning, would likely believe that he was subject to restraints on his freedom of the degree associated with formal arrest, and thus in custody for the purposes of *Miranda*.

Moreover, there is no dispute that Carr was in custody once he was *formally* placed under arrest for importation of narcotics into the United States, and restrained with handcuffs. *See Newton*, 369 F.3d at 676 ("[A] reasonable person finding himself placed in handcuffs by the police would ordinarily concluded that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police — in other words, that he was . . . in custody."); *United States v. Broughton*, 983 F. Supp. 2d 224, 231 (E.D.N.Y. 2013) (finding defendant who had been informed that she was "under arrest for importation of narcotics into the United States" and restrained by handcuffs was in a situation where "[a] reasonable

---

[10] The Second Circuit has not yet decided that this "reasonable individual" must be innocent. *See FNU LNU*, 653 F.3d 144, 151 n.6 (2d Cir. 2011) (noting that it is an "open question" as to whether Fourth Amendment doctrine requiring reasonableness, which refers to reasonable *innocent* person, applies to Fifth Amendment *Miranda* inquiry). Regardless, any reasonable individual in Carr's position — guilty or innocent — would conclude that he was subject to a restraint on freedom beyond the typical border situation, akin to formal arrest.

person would understand herself to be under formal arrest in these circumstances and thus in custody for the purposes of Miranda.").

### ii. Carr was interrogated in the pat-down room

The government next argues that the questions asked in the pat-down room were "routine border questions" and thus should not constitute interrogation under *Miranda*.[11] (Tr. 223:18–225:18.) Carr contends that the questions were not routine, and specifically referred to contraband and accomplices, and thus an officer reasonably should have known that the questions were likely to elicit an incriminating response.

In order to warrant *Miranda* warnings, a law enforcement official must engage in express questioning or its functional equivalent, involving a measure of compulsion above and beyond that which is inherent in custody itself. *Acosta*, 575 F.3d at 189 (quoting *Innis*, 446 U.S. at 301). This includes any words or actions that "are likely to have the force of a question on the accused and therefore be reasonably likely to elicit an incriminating response." *United States v. Zamora*, No. 13-CR-0398, 2014 WL 4375738, at *9–10 (N.D.N.Y. Sept. 4, 2014) (finding questioning reasonably was likely to elicit an incriminating response when border patrol agent asked "[is] there anything that I could help [you] with?" in response to handcuffed suspect's request to speak with supervisor, made after suspect had been arrested near the border and placed in the back of a patrol vehicle) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)). However, volunteered information or spontaneous statements, even if made when an individual is in custody, do not implicate *Miranda*. *See Innis*, 446 U.S. at 301; *Broughton*, 983 F. Supp. 2d at

---

[11] This argument was not raised in the government's brief in opposition to the motion, but was made at the hearing. In its briefing, the government relied on the argument that Carr was not in custody during the interrogation. (*See* Gov. Mem. L. in Opp'n to Def.'s Mot. to Suppress Statements 11–14, Docket Entry No. 18.)

231 (citing *Isasi v. Herbet*, 176 F. App'x 143, 144–45 (2d Cir. 2006); *United States v. Mason*, 550 F. Supp. 2d 309, 319 (E.D.N.Y. 2008)).

### 1. Pre-arrest statements

Carr's First, Second, and Third Statements made in response to the CBP officers' questioning in the pat-down room are suppressed. While it may have been "routine" for the CBP officers to question passengers about traveling companions and potential contraband in their luggage, those questions asked under the circumstances in the pat-down room constituted interrogation. Generally, "routine booking questions" about matters like identity and pedigree do not implicate *Miranda* only because a reasonable officer could not conclude that those questions are likely to elicit an incriminating response. *See United States v. Rodriguez*, 356 F.3d 254, 259 n.2 (2d Cir. 2004) ("[I]nformation solicited through routine questioning of arrested persons by law enforcement officers at the booking stage does not implicate the protections of Miranda."); *United States v. Adegbite*, 846 F.2d 834, 839 (2d Cir. 1988) ("[T]he solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by Miranda."); *see also Muniz*, 496 U.S. at 600 (accepting that asking suspect date of sixth birthday, when designed to determine that suspect was in confused mental state, constituted "interrogation" for suppression purposes).

The CBP officers should have known that their questions regarding Carr's traveling companions were "reasonably likely to elicit an incriminating response" from Carr. *See Innis*, 446 U.S. at 302 ("[T]he definition of interrogation can extend [] to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."); *Zamora*, No. 13-CR-0398, 2014 WL 4375738, at *9–10 (finding "[is] there anything that I could help [you] with?" sufficient to constitute interrogation). The testimony indicated that

some officer or officers asked Carr, in the form of a question or with the force of a question, about the weight of the drugs found in his luggage, about who owned the drugs, and, according to Carr, about his experience smuggling drugs.  These questions were objectively likely to elicit an incriminating response from Carr — an individual under suspicion of importing drugs.  *See Acosta*, 575 F.3d at 189 (noting "interrogation" refers to "'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response.'" (quoting *Innis*, 446 U.S. at 301)).  Moreover, while the analysis is properly focused on what the officer objectively should have known to be reasonably likely to elicit an incriminating response, *see Innis*, 446 U.S. at 302, the subjective intent of an officer in asking a question is a relevant, though not conclusive, part of that inquiry.  *See Rosa v. McCray*, 306 F.3d 210, 222 (2d. Cir 2005) (citing *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir.1983) ("The test is objective.  The subjective intent of the agent is relevant but not conclusive.")).  Here, Officer Twarowski testified that he asked Carr about his traveling companions *in order to determine* whether "there was somebody else on the flight [who was smuggling,] because they'll send two drug mules at the same time."  (Tr. 89:18–90:14; *see also* Tr. 120:16–24.)

Under these circumstances, the First, Second, and Third Statements made in the pat-down room prior to arrest — including any statements made during that time which repeated substantially similar incriminating information in response to the officers' questioning — were the product of a custodial interrogation without adequate warnings as required by *Miranda*, and are therefore suppressed.

### 2.  "You got me" statement

Officer Czechura testified that following Carr's arrest, she heard Carr make his Fourth Statement, "you got me."  (Tr. 25:1–26:18.)  No questions were asked of Carr before he made

the statement. (Tr. 26:13–23.) Though he had been interrogated earlier, not all custodial statements obtained in violation of *Miranda* require suppression of any subsequent statements. *See Oregon v. Elstad*, 470 U.S. 298, 309, 318 (1985) (holding that a suspect who has voluntarily responded to unwarned questioning is not thereby disabled from waiving his rights and confessing after *Miranda* warnings administered). The key inquiry is whether, examining the totality of the circumstances, the subsequent statements were knowingly and voluntarily made. *See id.*; *United States v. Pettigrew*, 468 F.3d 626, 636 (10th Cir. 2006) ("[T]he admissibility of an unsolicited inculpatory statement, following a voluntary statement made in violation of *Miranda*, turns on whether the inculpatory statement was knowingly and voluntarily made."); *United States v. Abdulla*, 294 F.3d 830, 837 (7th Cir. 2002) (holding statements voluntarily and spontaneously made subsequent to unwarned responses to custodial interrogation were properly admitted); *Medeiros v. Shimoda*, 889 F.2d 819, 826 (9th Cir. 1989) ("Although [the defendant's] second statement followed a previous voluntary but unwarned admission, the second statement was made voluntarily and, therefore, is admissible into evidence.").

It is not clear precisely when the Fourth Statement was made, but Officer Czechura heard it sometime after Carr's arrest, as she was inventorying Carr's luggage. (Tr. 25:1–26:18.) Officer Twarowski testified that shortly after the arrest, CBP officers explained to Carr that "the agents would come down and they're going to talk to him and ask him some more questions, [and that] it's in his best interest not to speak, not to say anything else, and just to wait until they arrive."[12] (Tr. 136:6–16; *see also* Tr. 94:24–95:25.) Though he was previously questioned and

---

[12] The officers instructed Carr not to speak after he was placed under arrest. (Tr. 95:3–25.) However, Officer Czechura, the only person to hear Carr say "you got me," could not recall if Carr made the statement before or after the arrest and pat-down. (*See* Tr. 27:18–28:11, 66:7–11.) Carr has offered no further information about the Fourth Statement.

not provided with *Miranda* warnings, the record indicates that Carr made the Fourth Statement without provocation or suggestion from the CBP officers. While Carr was initially questioned within a few minutes of entering the room, he was not arrested until fifteen or twenty minutes later, and all the evidence indicates that he spontaneously made this statement after arrest. Carr has not shown any evidence that any questions were asked of him within the intervening time. To the contrary, the evidence suggests that Carr may have volunteered the Fourth Statement in derogation of the CBP officers' warning that he should not say anything further. Carr has failed to establish that the Fourth Statement was a result of a custodial interrogation, and thus, it is not entitled to the presumption of coercion that *Miranda's* prophylactic rule affords such statements. Therefore, whether the Fourth Statement will be suppressed turns on whether it was voluntarily made. As discussed below, the statement was voluntary.

### b. All four statements made in the pat-down room were voluntary

Carr argues that even if the pre-*Miranda* statements are admissible as not having occurred during the course of a custodial interrogation, they should be suppressed as involuntary and coerced because the actions of the officers overbore Carr's will. (Mot. to Suppress 6.) He asserts that "uniformed and armed agents hovered over [him] while he was chained to a bench . . . . They began questioning him in an effort to get a confession. But [he] refused to answer their questions. . . . [T]hey continued questioning him until he allegedly broke down and confessed." (*Id.* at 7.) Carr felt "compelled to answer the officers' questions." (Carr Decl. ¶ 4.) The government argues that Carr voluntarily spoke with the officers.

The Due Process Clause prohibits the use of confessions that are not the product of a defendant's free will. *See United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991) ("The police may use a defendant's confession without transgressing his Fifth Amendment [due process] right only when the decision to confess is the defendant's free choice." (citing *New*

*York v. Quarles*, 467 U.S. 649, 653 (1984)). The central question in assessing whether a confession was given voluntarily is whether the defendant's "will was overborne" at the time of the confession. *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014) (citing *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011); *see also United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) ("A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." (quoting *Anderson*, 929 F.2d at 99)). Whether a defendant's will was overborne is determined by examining "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Taylor*, 745 F.3d at 23–24 (quoting *Anderson*, 929 U.S. at 99)). As discussed below, all of Carr's July 3, 2013 statements were voluntarily made.

As an initial matter, given the totality of the circumstances, Carr's First, Second and Third Statements — though obtained in violation of *Miranda* and therefore subject to suppression — were voluntary. There is no indication that Carr's will was overborne at the time he made the initial statements in response to questioning from the CBP officers. Carr was not faced with actual violence, threats of violence or implied or express promises. *See Hutto v. Ross*, 429 U.S. 28, 30 (1970) (noting that an involuntary confession is one that was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." (alterations in original) (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897)) (internal quotation marks omitted)). He has not alleged, and there is no evidence showing, that his mental capacity was diminished in any way, or that he was otherwise particularly susceptible to the pressures of the situation. *See Taylor*, 745 F.3d at 23–24 (mental incapacity due to drug intoxication). Furthermore, the testimony shows that Carr was not tricked or otherwise coerced into making the initial statements.

As for Carr's Fourth Statement, "you got me," made under similar circumstances later in time to a different officer, this was not rendered involuntary simply because of the unwarned statements Carr gave in response to earlier custodial interrogation. *See Pettigrew*, 468 F.3d at 636–37. Carr made his Fourth Statement approximately twenty minutes after the initial statements. The Fourth Statement was spontaneous and not in response to questioning from any of the CBP officers. To the contrary, Carr may have been told not to say anything further. *See Medeiros*, 889 F.2d at 824 (finding statement voluntary when, *inter alia*, the officers repeatedly told the defendant not to say anything further). While Carr was arrested after the First, Second and Third Statements and before the Fourth Statement, and Officer Czechura started the inventory of his luggage around the time of the arrest, neither of these events interfered with Carr's free choice to speak or not to speak. *See Anderson*, 929 F.2d at 96; *see also Elstad*, 470 U.S. at 312 ("There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given . . . ."); *Pettigrew*, 468 F.3d at 637–38 ("Even considering some lingering psychological effect of his first two statements, based on the totality of the circumstances, we conclude that the third statement [made a half-hour later to a different officer, in a different location] was 'an essentially free and unconstrained choice by its maker.'" (citations omitted)); *Abdulla*, 294 F.3d at 836–37 (reaching same conclusion on similar facts); *Medeiros*, 889 F.2d at 824–25 (same). Thus, any argument by Carr that the psychological impact of having "let the cat out of the bag" during the earlier questioning was a source of coercion is not persuasive. *See Pettigrew*, 468 F.3d at 636 (discussing psychological impact of having "let the cat out of the bag," but noting that the Supreme Court "has never gone so far as to hold that making a confession under circumstances

which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." (quoting *United States v. Bayer*, 331 U.S. 532, 540–41 (1947))).

The evidence indicates that Carr's post-arrest, pre-*Miranda* warning statement was voluntary.  Under the circumstances, it is not subject to suppression.

### III.  Conclusion

For the foregoing reasons, the Court grants Carr's motion to suppress the statements made in the private pat-down room on July 3, 2013 as to the pre-arrest statements, and denies Carr's motion as to all statements made in the primary and secondary screening areas and the statement overheard by Officer Czechura during the inventory of his luggage.


SO ORDERED:


_____
    s/ MKB
MARGO K. BRODIE
United States District Judge


Dated: November 24, 2014
        Brooklyn, New York